## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| **CAMILLE NWAEFULU**<br>c/o Fox & Moghul<br>10509 Judicial Drive, Suite 300<br>Fairfax, Virginia 22030<br><br>*Plaintiff,*<br><br>v.<br><br>**MARIUS IFEDIORANMA CHUKWURAH**<br><br>*Defendant.* | Case No.: _____ |

## COMPLAINT

COMES NOW, Plaintiff Camille Nwaefulu ("Ms. Nwaefulu"), by and through undersigned counsel, and hereby files this complaint for defamation against Defendant Marius Chukwurah and alleges as follows:

## INTRODUCTION

This is an action for defamation per se and, in the alternative, defamation per quod arising from Defendant's publication on or about August 20, 2025 of a coordinated, multi-part series of Instagram Story posts (the "Story Series") in which Defendant accused Ms. Nwaefulu of serious misconduct.

1

Virginia recognizes defamation per se where the defamatory content appears on its face and falls within specific categories[1], such statements are "so obviously meant to damage a person's reputation that the plaintiff need not prove damages, instead damages are presumed." Here, Defendant's publications are actionable as defamation per se because they fall within the recognized per se categories, including statements that "prejudice a person in his or her profession or trade." See Shupe v. Rose's Stores, 213 Va. 374, 376, 192 S.E.2d 766, 767 (1972).

Defendant's accusations necessarily undermine the integrity, rule compliance, and trustworthiness required for Ms. Nwaefulu's profession as a senior cybersecurity engineer and are "meant to 'prejudice [her] in [her] profession or trade.'" In the Story Series, Defendant accused Ms. Nwaefulu of serious misconduct, including:

(a) criminal stalking and harassment;

(b) fabricating claims and lying in university proceedings;

(c) manipulating others through "misinformation" and "blatant lie[s]";

(d) being a "con-artist"; and

(e) suffering from severe psychiatric disorders, framed as a medical diagnosis "in [Defendant's] professional medical opinion."

Defendant published these accusations to an audience of tens of thousands through a social-media account on which Defendant presents himself as a medical professional. The statements were false and made with common-law malice, entitling Ms. Nwaefulu to presumed compensatory and punitive damages. The accusations necessarily prejudice Ms. Nwaefulu in

---

[1] The four defamations per se categories are: imputing the commission of a crime involving moral turpitude, imputing infection with a contagious disease; Imputing unfitness to perform, or lack of integrity in the performance of, the duties of a job or office; or, necessarily prejudicing a person in his or her profession or trade. Shupe v. Rose's Stores, 213 Va. 374, 37, (1972).

2

her profession as a senior data-protection/cybersecurity engineer by impugning her integrity, judgment, and reliability.

In the alternative, to the extent any of Defendant's statements are not deemed actionable as defamation per se, the Story Series nonetheless constitute defamation per quod because Ms. Nwaefulu suffered special damages/actual injury, including reputational harm, emotional upset, embarrassment, humiliation, mental suffering, and related economic harm and lost opportunities, in amounts to be proven at trial.

## PARTIES

1.    Plaintiff Camille Nwaefulu is a natural person domiciled in Virginia, and therefore a citizen of the Commonwealth of Virginia.

2.    Defendant Marius Chukwurah is a natural person domiciled in Maryland, and therefore a citizen of the State of Maryland.

## JURISDICTION AND VENUE

3.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(a)(1).

4.    The amount in controversy exceeds $75,000, exclusive of interest and costs, because Defendant published and republished defamatory statements to a large audience, causing reputational injury, emotional distress, and other compensable damages.

## FACTS

5.    In late 2017, one woman who was then a student at Howard University contacted Ms. Nwaefulu through a mutual friend seeking informal guidance regarding Defendant's alleged sexually harassing conduct, including filming videos of the parties' sexual

3

intercourse without consent and distributing them to third parties, and regarding the University's reporting options.

6.      Around the same time, Ms. Nwaefulu also became aware of similar concerns raised by a second Howard University student through a mutual connection.

7.      Shortly after, Ms. Nwaefulu became aware that the second associated individual had experienced similar conduct by Defendant. After recognizing that the first complainant had already participated in the University's reporting process, Ms. Nwaefulu connected the two individuals so that the second individual could draw on the first student's experience to better understand her own reporting options and participate in the process more effectively.

8.      Ms. Nwaefulu provided limited personal guidance regarding Howard University's Title IX policies and reporting procedures, based on her familiarity with interpreting institutional policies and her then legal education experience.

9.      To Ms. Nwaefulu's knowledge, at least two complainants later filed Title IX complaints, and Howard University charged Defendant with sexual harassment under its Title IX policy on or about February 15, 2018. See Exhibit A: 2018 Howard University Report.

10.     After Defendant learned that Ms. Nwaefulu had communicated with one or more complainants and offered limited assistance regarding reporting options, Defendant began disparaging Ms. Nwaefulu to others within their shared community and mutual friend group.

11.     From 2018 through 2024, Ms. Nwaefulu repeatedly received inquiries from friends and acquaintances regarding rumors and negative narratives about her that were circulating online.

4

12.     In 2024, after receiving renewed messages and reactions from third parties about the rumors and online discourse initiated by Defendant, Ms. Nwaefulu posted four photographs with a brief statement and attached the 2018 Howard University report for clarification purpose. See Exhibit B: 2024 Posts.

13.     On or about August 20, 2025, Defendant responded by publishing a coordinated Instagram Story series consisting of approximately fifty-one posts to an audience of tens of thousands, which forms the basis of this action. See Exhibit C: 2025 Story Series.

### a. Ms. Nwaefulu's Profession and the Nexus to Defendant's Accusations

14.     Ms. Nwaefulu is a Senior Engineer in data protection and employed by a large, global payments technology company, where she designs and supports enterprise-wide data protection architecture, including encryption, tokenization, data classification, and access-governance controls across numerous applications and systems.

15.     Ms. Nwaefulu's profession requires exceptional integrity, credibility, discretion, sound judgment, and the ability to make accurate decisions under high pressure. Cybersecurity and cryptography professionals handle highly sensitive information, so strict adherence to rules, careful judgment, and trustworthiness are essential for others to rely on them and work with them. False allegations regarding instability or unethical conduct also jeopardize professional trust and, where applicable, clearance eligibility.

16.     Defendant knew of Ms. Nwaefulu's employment and professional role because her employment and cybersecurity/data-protection work were publicly available on her LinkedIn profile and referenced on her public Instagram profile, which Defendant could view and rely upon in making his statements.

5

17.    Defendant's accusations that Ms. Nwaefulu fabricated claims in proceedings, manipulated witnesses, lied, engaged in collusion, and suffers from serious DSM-5 disorders necessarily undermine Ms. Nwaefulu's professional reputation for honesty, sound judgment, and reliability. Ms. Nwaefulu also holds a security clearance, the eligibility for which is necessarily jeopardized by false public accusations of dishonesty, mental instability, and misconduct.

**b. Defendant's Occupation, Instagram Account, Audience, and Publication Format**

18.    Defendant maintains and controls a public Instagram account under the handle "**@dr_mazi.** The account identifies Defendant by name, displays photographs of Defendant, and presents Defendant as a physician and medical specialist. See Exhibit D: Instagram Profile.

19.    As the Exhibit D shows, Defendant identifies himself on that account as "Mazi, MD, FACC," and describes himself as a cardiologist and a board-certified sports cardiologist, with medical training and professional affiliations including MGH–Harvard, Penn Cardiology, and Duke Medicine.

20.    On information and belief, at the time of publication, Defendant's account had approximately 48,000–50,000 followers.

21.    On or about August 20, 2025, Defendant published a multi-part Instagram Story series titled "For the record," consisting of dozens of slides, including text slides, screenshots, and embedded commentary (the "Story Series").

22.    Defendant's Story Series was viewable by Defendant's followers and other Instagram users who accessed Defendant's account during the Story availability period, and on information and belief, was saved or republished in a manner extending its visibility beyond

6

the normal Story duration. Specifically, Defendant pinned the Story Series to his page for approximately four months, significantly prolonging public access to its defamatory content.

23.    Defendant's self-presentation as a physician and medical specialist—combined with his prominent use of medical titles and credentials on his public profile—was intended to, and did, lend credibility and authority to his statements, including his purported "professional medical opinion" about Ms. Nwaefulu's mental health and related accusations presented as fact, not opinion, to his readership.

**c. The Story Series Was "Of and Concerning" Ms. Nwaefulu**

24.    Defendant's Story Series was "of and concerning" Ms. Nwaefulu because Defendant identified Ms. Nwaefulu by name ("Camille"), by nickname ("Cami"), and by references to Ms. Nwaefulu's alleged actions and identity, and Defendant also posted Ms. Nwaefulu's photograph and video with her face clearly visible.

25.    Defendant also included imagery and contextual identifiers sufficient to allow ordinary viewers to understand that Defendant was referring to Ms. Nwaefulu.

## THE DEFAMATORY ALLEGATIONS

26.    Defendant's Story Series began by framing Ms. Nwaefulu as deceptive, stating: "While she presents herself as a women's advocate and a neutral bystander, there's a lot more to this story that hasn't been told." See Exhibit C: 2025 Story Series, at p. 1.

27.    Defendant first accused Ms. Nwaefulu of stalking, harassment, and extreme pursuit multiple men, stating: "I was warned about her past by multiple close trusted people… explicitly informed about individuals she had previously obsessed over, as well as the extremes

to which she stalked and harassed them to stay around after they attempted to dissociate themselves from her, I took heed." See Exhibit C: 2025 Story Series, at p. 5.

28.     Defendant's post states that Ms. Nwaefulu "aggressively pursuit" him to the extent of danger to Defendant and his family: "[In 2017]… she continued her aggressive pursuit to the point of my discomfort and those of my family members." See Exhibit C: 2025 Story Series, at p. 5.

29.     Defendant's post states that Ms. Nwaefulu "have done this to so many people" and sensationalized the accusation by asserting Ms. Nwaefulu followed a man internationally: "Following this man to his hometown in NIGERIA?! Come on now…" See Exhibit C: 2025 Story Series, at p. 8, 27.

30.     Defendant second accused Ms. Nwaefulu of dishonest misconduct in legal or quasi-legal proceedings, claiming that: "Through actual legal proceedings and document review, it immediately became apparent she was going in under the name 'Cami Nwae' making false claims as a bystander witness, and influencing the claims… by sharing misinformation… concealed in blatant lie." "Camille, stop spewing false claims, documents … See Exhibit C: 2025 Story Series, at p. 14, 23.

31.     Defendant directly accused Ms. Nwaefulu of being a liar and con-artist, stating: "You manipulated and lied to women for your own purpose. Bitter scorned con-artist at best…" "You? Lies and behind fake names…" "you continued to do what you do best, loudly lie." See Exhibit C: 2025 Story Series, at p. 18, 20.

32.     Defendant also accused Ms. Nwaefulu of psychiatric disorders and framed his accusations as a medical diagnosis, stating: "Camille… in my professional medical opinion…

8

suffering something in the intersecting overlapping realm of borderline, narcissistic and histrionic personality disorders" and "Delusion for sure." See Exhibit C: 2025 Story Series, at p. 22.

33.     Defendant repeated and amplified these defamatory psychiatric accusations in other commentary and by endorsing third-party statements presented in the Story Series, including a third-party comment stating: "I work in psychiatry. It's definitely giving Borderline Personality Disorder for sure." See Exhibit C: 2025 Story Series, at p. 26.

34.     Taken individually and together, Defendant's accusations of (i) stalking and harassment, (ii) dishonest misconduct in legal or quasi-legal proceedings, and (iii) severe psychiatric disorders presented as a medical diagnosis necessarily prejudice Ms. Nwaefulu in her profession or trade by impugning the integrity, judgment, discretion, and reliability essential to her work as a senior cybersecurity engineer and security clearance holder, and therefore fall within a recognized defamation per se category.

35.     Defendant cannot invoke qualified privilege to shield the Defamatory Statements because Defendant published them to numerous third parties who had no corresponding duty, interest, or connection to any alleged investigation or proceeding, including a broad Instagram audience of followers and other uninvolved individuals. Gov't Micro Res. v. Jackson, 271 Va. 29, 43 (2006); Cashion v. Smith, 286 Va. 327, 339 (2013).

36.     Here, Defendant did not limit any purported "investigation-related" accusations to persons with a legitimate duty or interest. Rather, Defendant broadcast the accusations to a broad Instagram audience of uninvolved third parties rather than limiting them to any

9

legitimate common-interest recipients, any qualified privilege is inapplicable or was forfeited by unnecessary wide publication. Cashion, 286 Va. at 339.

37.    In addition, qualified privilege does not protect statements made with malice, including statements made with knowledge of falsity or reckless disregard for the truth. Gov't Micro Res., 271 Va. at 43; Cashion, 286 Va. at 339. Defendant's publication was made with malice and included false statements of the Howard University Title IX proceedings.

38.    Defendant's accusations were not expressions of opinion. Defendant had reinforced that he "always provide the facts," (See Exhibit C: 2025 Story Series, at p. 8 and 27.) and Defendant did not present the statements as subjective insults, loose hyperbole, or rhetorical commentary.

39.    The Fourth Circuit has squarely held that prefacing defamatory statements with "in my opinion" does not shield a defendant from liability when the statements imply the existence of undisclosed defamatory facts. See Swengler v. ITT Corp. Fed. Sys. Div., 993 F.2d 1063, 1071 (4th Cir. 1993) (holding that "statements clearly implying the existence of facts are actionable as defamation" regardless of an opinion label). Here, Defendant's invocation of his "professional medical opinion" does not transform his statements into protected opinion. By invoking his medical expertise and employing DSM-5 diagnostic categories, it implies that Defendant possesses undisclosed medical knowledge supporting his accusations, making the statements more—not less—actionable as implied assertions of fact. See also Carwile v. Richmond Newspapers, 196 Va. 1, 7, 82 S.E.2d 588, 592 (1954).

40.    Defendant's statements were therefore reasonably understood by ordinary viewers not as casual insults but as medical conclusions rendered by a psychologist.

10

## FALSITY

41.    The defamatory statements Defendant made in the Story Series are false.

42.    The defamatory statements, express and implied, that Ms. Nwaefulu engaged in criminal stalking, including by "stalk[ing] and harass[ing]" Defendant and others "to the extremes," are false.

43.    The defamatory statements, express and implied, that Ms. Nwaefulu is a "con artist" are false.

44.    The defamatory statements, express and implied, that Ms. Nwaefulu repeatedly pursued Defendant "to the point of [his] discomfort and those of [his] family members," and that Ms. Nwaefulu caused Defendant and his family to fear or feel threatened, are false.

45.    The defamatory statements, express and implied, that Ms. Nwaefulu physically followed men as part of a pattern of stalking or harassment, including the statement "Following this man to his hometown in NIGERIA?!," are false.

46.    The defamatory statements, express and implied, that Ms. Nwaefulu has "done this to so many people," including that she stalked and harassed multiple individuals and that others attempted to "dissociate themselves from her," are false.

47.    The defamatory statements, express and implied, that Ms. Nwaefulu made "false claims" in connection with legal or university proceedings are false.

48.    The defamatory statements, express and implied, that Ms. Nwaefulu manipulated anyone in any proceeding are false.

11

49. The defamatory statements, express and implied, that Ms. Nwaefulu improperly influenced, manipulated, or coordinated complainants by "sharing misinformation" or "blatant lie[s]," or that Ms. Nwaefulu participated in "collusion," are false.

50. The defamatory statements, express and implied, that "actual legal proceedings and document review" established that Ms. Nwaefulu was making false claims as a bystander witness, or otherwise proved Ms. Nwaefulu's dishonesty, are false.

51. The defamatory statements, express and implied, that Ms. Nwaefulu suffers from serious mental illness or psychiatric disorders, including Defendant's purported "professional medical opinion" that Ms. Nwaefulu has borderline, narcissistic, or histrionic personality disorders, are false.

52. The defamatory statements, express and implied, that Defendant can and/or is capable of diagnosing Ms. Nwaefulu's mental health and that his statements reflect legitimate medical conclusions about Ms. Nwaefulu are false.

53. Ms. Nwaefulu never engaged in any sort of criminal stalking or harassment, did not make false claims, deceive, manipulate, or interfere with any investigation or proceeding. She does not suffer from the serious mental illness or psychiatric disorders Defendant purported to diagnose.

54. In determining whether a publication is defamatory and how an ordinary reader would understand it, Virginia courts do not parse isolated phrases in a vacuum. Rather, Courts evaluate the challenged publications as a whole, including the overall narrative and the reasonable inferences they invite, in assessing both defamatory meaning and the harm to the Ms. Nwaefulu's reputation. See Cashion v. Smith, 286 Va. 327, 338 (2013).

12

55.     To read the Story Series in its totality, Defendant presented a coordinated narrative that Ms. Nwaefulu obsessively pursued Defendant and, once rejected, retaliated against him by fabricating allegations and recruiting unrelated women to echo and amplify false accusations against him.

56.     Defendant also portrayed Ms. Nwaefulu as a frightening, unstable, and obsessive pursuer who fixated on men and harassed them to the point of criminal stalking. Defendant also invoked his own medical authority and used uncommon clinical terminology to "diagnose" Ms. Nwaefulu, making the narrative appear more credible and authoritative to ordinary viewers. In doing so, Defendant reinforced a damaging first impression that cast Ms. Nwaefulu as dangerous and untrustworthy, and encouraged others to ostracize and isolate her within their shared community.

## FAULT

57.     In publishing false and defamatory statements regarding Ms. Nwaefulu, Defendant acted, at minimum, with negligence, and with common law malice—that is, with personal spite, ill will, and retaliatory motive independent of any legitimate occasion for the communication. Defendant's conduct further rises to the level of constitutional malice—that is, with knowledge of falsity or reckless disregard for truth or falsity—supporting an award of punitive damages.

58.     Defendant knew or should have known that these malicious accusations would prejudice Ms. Nwaefulu in her profession or trade.

59.     Ms. Nwaefulu is a private individual and, as such, need only prove negligence to support her defamation claim against Defendant. Defendant's conduct satisfies that

standard and more. Beyond negligence, Ms. Nwaefulu alleges that Defendant acted with malice, behavior actuated by motives of personal spite and ill will, independent of any legitimate occasion for the communication. See Union of Needletrades, Indus. & Textile Emps., AFL-CIO v. Jones, 268 Va. 512, 519–20 (2004). Further still, Defendant's conduct rises to the level of constitutional malice, which is with knowledge that the defamatory statements were false or reckless disregard for whether they were true or false.

60.     Ms. Nwaefulu has never been a public figure or limited-purpose public figure. Ms. Nwaefulu did not voluntarily inject herself into any public controversy. She did not seek public attention concerning Defendant, the Howard University matter, or any related events, and she did not undertake any campaign to make herself a public figure. To the contrary, Ms. Nwaefulu sought to remain private and to minimize public attention, and she did not publish content about Defendant until she felt compelled to respond to ongoing rumors and inquiries from members of their shared community.

61.     Defendant's malice is demonstrated by the retaliatory nature and context of his publications. Defendant published the Story Series in direct retaliation for Ms. Nwaefulu's limited advice and assistance to one or more individuals regarding reporting options and processes under Howard University's Title IX policy concerning Defendant's alleged sexual conduct. Defendant's Story Series accused Ms. Nwaefulu of criminal or criminal-like stalking and harassment, dishonest misconduct in connection with legal or university proceedings, and serious psychiatric disorders stated as "professional medical opinion." Defendant's publications were stated as fact, and presented as supported by supposed "document review,"

14

"legal proceedings," law-enforcement involvement, and Defendant's asserted professional medical authority.

62.    Defendant further leveraged his medical credentials and professional title improperly to lend authority to his accusations, thereby creating a far greater likelihood that ordinary viewers would understand his statements as grounded in professional expertise rather than mere personal animus.

63.    Defendant's accusations were calculated to harm Ms. Nwaefulu's good name and reputation within their shared community. Defendant knew, or at minimum should have known, that publicly labeling Ms. Nwaefulu as a stalker, liar, and mentally ill person would foreseeably subject her to scorn, hostility, and isolation, and would harm her personal and professional standing. This conduct independently establishes common law malice, behavior driven by personal spite and a desire to punish and silence Ms. Nwaefulu, and, at a bare minimum, constitutes negligence in that no reasonable person exercising ordinary care would have published such accusations to a mass audience in the manner Defendant chose.

64.    Defendant's common law malice is further demonstrated by the unnecessarily wide publicity and disproportionate language of his publications, each of which is independently recognized under Virginia law as evidence of abuse sufficient to overcome any claim of privilege. Defendant chose to broadcast his accusations to a large social-media audience, including forty-eight thousand of his followers, through a coordinated series of approximately fifty-one story posts designed to amplify and reinforce his defamatory narrative. Defendant further identified Ms. Nwaefulu by publishing photographs and videos depicting her face clearly visible, without her consent, and by using intemperate and disproportionate

15

language—including labeling Ms. Nwaefulu a "con-artist," a stalker, and mentally ill—that went far beyond any legitimate informational purpose as Defendant's statements were calculated to maximize exposure and humiliation to Ms. Nwaefulu.

65.    At a minimum, Defendant's conduct constitutes negligence in that no reasonable person exercising ordinary care would have published the accusations described herein to a mass audience, in the manner and scope Defendant chose, without verifying their truth. Beyond negligence, the totality of Defendant's conduct, including his retaliatory motive, the disproportionate scope of publication, the use of intemperate language, and the deliberate identification of Ms. Nwaefulu by name and photograph, establishes common law malice by a preponderance of the evidence.

66.    Further still, this same conduct also supports a finding of constitutional malice by clear and convincing evidence, entitling Ms. Nwaefulu to an award of punitive damages. See Jordan v. Kollman, 269 Va. 569, 575 (2005) (constitutional malice required for punitive damages in all defamation cases, whether the plaintiff is a public or private figure).

## DAMAGES

67.    Defendant's defamatory statements were malicious and in retaliation for Ms. Nwaefulu's limited advice and assistance to one or more individuals regarding reporting options and processes under Howard University's Title IX policy concerning Defendant's alleged conduct.

68.    Defendant's defamatory publications caused substantial harm to Ms. Nwaefulu, including injury to her reputation, humiliation, embarrassment, mental anguish, and loss of standing within her shared community.

16

69.    Defendant published the Story Series to a large social-media audience and identified Ms. Nwaefulu by name and by posting her image with her face clearly visible. As a result, the defamatory accusations were disseminated widely and were understood by third parties to refer to Ms. Nwaefulu, causing reputational harm that was immediate and lasting.

70.    Following Defendant's publications, Ms. Nwaefulu received numerous hostile and accusatory communications from third parties reacting to Defendant's posts, including via Instagram direct messages, text messages, and post comments. Since the publication of Defendant's defamatory statements, Ms. Nwaefulu receives negative direct messages and hostile comments directed at her character and professional reputation.

71.    Defendant's publications caused Ms. Nwaefulu significant emotional distress, including anxiety, fear, sleeplessness, loss of concentration, persistent worry about her personal safety, social isolation, and strain in personal relationships as members of the community reacted to the defamatory narrative. The resulting harm to her physical and emotional well-being has been severe enough that she has been forced to seek professional psychiatric and medical support to cope. Moreover, Defendant's false characterization of Ms. Nwaefulu as suffering from serious psychiatric disorders, framed as a medical diagnosis, compounded this harm by attaching a stigma that made it more difficult for Ms. Nwaefulu to seek support within her own community, prolonging and extending her emotional and reputational injury.

72.    Defendant's publication also caused Ms. Nwaefulu to suffer financial loss. In addition to her corporate employment, Ms. Nwaefulu used Instagram and other online platforms to build visibility and credibility for her business ventures, including offering online

17

financial education and consultations to clients obtained through her social media presence. Because these services are relationship-based and depend on personal credibility, accusations that Ms. Nwaefulu is dishonest, manipulative, or mentally unstable predictably undermined client trust and her ability to attract and retain clients.

73. After Defendant published the Story Series, Ms. Nwaefulu reasonably curtailed her online presence and reduced or stopped posting financial content and advertisements because of the volume of hostile responses and the risk that continued online engagement would draw additional harassment and reputational harm.

74. The injuries to Ms. Nwaefulu were a direct and natural consequence of, and were directly and proximately caused by, Defendant's false and defamatory statements, express and implied, of and concerning Ms. Nwaefulu in the Story Series and related publications on Instagram, including dissemination to Defendant's followers and other third parties within Ms. Nwaefulu's personal and professional communities.

## COUNT I
### DEFAMATION AND LIBEL PER SE
### (ALTERNATIVE, DEFAMATION PER QUOD)

75. Ms. Nwaefulu repeats and realleges each and every allegation set forth in above in this Complaint as if fully set forth herein.

76. Defendant published defamatory statements concerning Ms. Nwaefulu, as set forth above, to Defendant's Instagram followers and other third parties by means of the Story Series posted on Defendant's public Instagram account "@dr_mazi," and by further disseminating and amplifying those statements through Instagram's sharing and viewing features.

18

77. These defamatory statements specifically refer to and identify Ms. Nwaefulu by name and related identifiers, including by referring to her as "Camille" and "Cami Nwae," and by posting photographs depicting Ms. Nwaefulu with her face clearly visible. These references were sufficiently specific that third parties were able to identify Ms. Nwaefulu and contact her regarding Defendant's publications.

78. These defamatory publications falsely state, imply and/or suggest that Ms. Nwaefulu engaged in criminal or criminal-like stalking and harassment, including repeated pursuit and physical following of individuals in a fear-inducing manner, and other abusive conduct toward Defendant and multiple other individuals.

79. These defamatory publications falsely state, imply, and/or suggest that Ms. Nwaefulu engaged in dishonesty and misconduct in connection with legal or university proceedings, including by making "false claims," using a different name to do so, influencing complainants through misinformation and "blatant lie[s]," and participating in "collusion" to drive false accusations.

80. These defamatory publications falsely state, imply and or suggest that Ms. Nwaefulu suffers from serious mental illness or psychiatric disorders, including by using the language, "in my professional medical opinion," that Ms. Nwaefulu has borderline, narcissistic, and histrionic personality disorders and otherwise presenting diagnostic labels as medical conclusions.

81. The defamatory publications referenced in in the complaint have a tendency to expose Ms. Nwaefulu to public hatred, contempt, embarrassment, ridicule, or disgrace, and to cause Ms. Nwaefulu to be shunned and isolated within her shared community.

19

82.     In publishing the defamatory statements referenced in the complaint Defendant acted either with knowledge of their falsity and/or with reckless disregard for the truth or falsity of these statements. Defendant also acted with negligence in failing to use reasonable care before publishing the accusations as fact to a large social-media audience.

83.     First, among the statements described in paragraphs 1 through 64, Defendant published statements that are defamatory on their face and constitute libel per se because they portray Ms. Nwaefulu as dangerous, unstable, and untrustworthy—including by accusing her of stalking and harassment—and therefore necessarily prejudice Ms. Nwaefulu in her profession and trade by impugning her judgment, reliability, and fitness for a high-trust professional role.

84.     Second, among the statements described in paragraphs 1 through 64, Defendant published statements that are defamatory on their face and constitute libel per se because they impute dishonesty, fabrication, and manipulation in connection with purported university or quasi-legal proceedings, thereby necessarily undermining the integrity, rule compliance, and trustworthiness required for Ms. Nwaefulu's professional work, security clearance and online client-facing services, and therefore prejudicing Ms. Nwaefulu in her profession and trade. See Thurston v. BankUnited, N.A., No. 7:24-cv-00649, 2025 WL (W.D. Va. Dec. 16, 2025).

85.     Third, among the statements described in paragraphs 1 through 64, Defendant published statements that are defamatory on their face and constitute libel per se because they falsely portray Ms. Nwaefulu as suffering from serious psychiatric disorders as a matter of "professional medical opinion," thereby imputing unfitness and unreliability and necessarily

prejudicing Ms. Nwaefulu in her profession and trade, which depends on discretion, credibility, and accurate decision-making under pressure.

86.    Fourth, among the statements described in paragraphs 1 through 64, Defendant published statements that are defamatory on their face and constitute libel per se because they directly label Ms. Nwaefulu a "con-artist." Here, Defendant did not use "con-artist" as casual hyperbole; Defendant embedded the accusation within a detailed multi-post factual exposé making specific allegations of manipulation, and deception, published to an audience of approximately 48,000–50,000 followers. Such an accusation independently constitutes defamation per se because it necessarily prejudices Ms. Nwaefulu in her profession[2] as a cybersecurity engineer, where trustworthiness and integrity are indispensable qualifications.

87.    Each of the categories of defamatory statements described in Paragraphs 77–80 provides an independent and alternative basis for liability and defamation per se. Ms. Nwaefulu is entitled to relief upon proof of any one category, any combination of categories, or all categories.

88.    In the alternative, to the extent any of Defendant's statements are not deemed actionable as defamation per se or libel per se, those statements nevertheless constitute defamation (libel) per quod, and Ms. Nwaefulu has suffered special damages/actual damages as a direct and proximate result, including harm to reputation and standing, personal humiliation and embarrassment, emotional distress, and economic harm and lost opportunities

---

[2] There were court held that calling someone a "scammer" or "con artist" constituted defamation per se as it "charged the [plaintiffs] with the commission of a serious crime" and imputed "fraud, dishonesty, misconduct, or unfitness in conducting [their] profession." Levy v Nissani, 115 N.Y.S.3d 418, (2020).

21

(including lost or diminished client inquiries and reduced online engagement), in amounts to be proven at trial.

89. The statements referenced in paragraphs 1 through 64 directly and proximately caused actual harm to Ms. Nwaefulu, who has suffered severe damage to her reputation and profession as a Senior Engineer in data protection and cryptography, personal humiliation, embarrassment, and anguish, as well as emotional distress, and, to the extent required, special damages including loss of reputation and standing in the community, embarrassment, **humiliation, and mental suffering.**

90. The statements referenced in paragraphs 1 through 64 caused Ms. Nwaefulu to suffer financial loss, including lost business opportunities and lost income, in an amount to be **proven at trial.**

WHEREFORE, Ms. Nwaefulu respectfully requests that this Honorable Court award judgment in favor of Ms. Nwaefulu and against Defendant on Counts I and II, and award compensatory damages in the amount of $875,000, punitive damages in the amount of $350,000, pre- and post-judgment interest, costs, and such other and further relief as the Court **may deem appropriate.**

## TRIAL BY JURY DEMANDED

**VERIFIED COMPLAINT** – I affirm that the statements made herein are true and correct to the best of my knowledge, information and belief.



Camille Nwaefulu

Respectfully submitted,
Camille Nwaefulu
By Counsel

/s/ George B. Mickum

George B. Mickum, Esq. (VSB No.: 24385)
Donna Z. Zhang, Esq. (VSB No.: 101748)
Fox & Moghul
10509 Judicial Drive, Suite 300
Fairfax, VA 22030
(T): (703) 652-5106
(F): (703) 956-1813
Mickum@moghullaw.com
Zhang@moghullaw.com
*Counsel for Plaintiff*

23

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and accurate copy of the foregoing Complaint is delivered on this 18th day of March 2026 via private process server to:

**Marius Ifedioranma Chukwurah**
**8001 Woodmont Avenue, Apt. 1317**
**Bethesda, MD 20814-3781**
*Pro Se Defendant*

And a copy of the Complaint is also mailed in <u>Certified Mail</u> to:
**4615 MARIELLE DR,**
**ROSEDALE, MD 21237-3747**
marius.chuk@gmail.com
*Pro se Defendant*

/s/ George B. Mickum

George B. Mickum, Esq

24

EXHIBIT C





**Left screen:**

4:33

For the record 🔖 August 20

When I first heard about her comments resurfacing last year, I didn't respond. I was preparing for 3 major board exams and chose not to let it derail me.

At the time, I saw it as a distraction just as it was in 2017. It was clear she wanted a platform to drag my name and paint me as something that I am not.

But as I continue to be made aware of whispers in my respective communities, I think it's about time to set the record straight.

Send message...

**Right screen:**

4:33

For the record 🔖 August 20

The reality is this issue started in 2016. She was introduced to me by a mutual party who made claim that she was visiting the area and looking to connect with people in the area. So he asked me as a favor if I would show her around. That's exactly what I did, thinking I was looking out for a colleague. However, there was a hidden agenda, which later was revealed in her actively aggressively pursuing me. I quite literally displayed no interest towards her, but thought I would play coy thinking I was being nice and preserving her feelings by allowing her to stay in the space of my associates and friends. I actually was hoping she'd find interest in somebody else like a classmate of mine or the like. That was my biggest mistake.

Initial exhibits to follow, with the first displaying a social gathering I hosted in my apartment, inviting her to meet people in my community so she could form other connections.

Send message...

2



3







**For the record** August 20

5/2017
Series of exhibit A

Yo your stalker called me bugging

She = Camille

I might have to block this chick

Damn smh. What happened

Hope the broad didn't utter my name

She did

You finally came to your senses and blocked her and she found out lmao

Called me wylin like I was actually gonna tell her something

Next thing I know she on the phone talking to herself

For like 30 mins

Send message...

---

**For the record** August 20

Exhibit A contd.

The chick is psycho man. Like she not worried about me but checking to see that I unfollowed her and now she wyling lol

Lol right

Man tell that chick we all on to her and she needs to stop being sloppy pressed lol

I could really blast her if you want me to

But I honestly planned on just not answer her calls anymore

Man I lowkey want you to do this jawn can receive a reality check. She really don't realize that my , you, and my boy have all give me the 411 with these movements she

Send message...



7



8











**4:34**

**For the record** 🎭 August 20    ···   ✕

Concurrently while dealing with these claims brought to my school, the Metropolitan Police Department contacted me and revealed that I was being investigated for alleged unwanted advances towards the same 2 women, spreading defamatory statements about them and sharing nonconsensual pictures and/or videos of their nudity or committing sexual acts publicly to unnamed individuals and on social media.

As a result, they seized my phone for 48 hours to do a forensic investigation of my messages, albums, apps and iCloud. I was more alarmed at the fact that I was not prepared to be without a phone during interview season than any of the claims they were looking into as I knew they were false.

Of course, there was absolutely nothing to be found involving me or any of the individuals making claims. What didn't make sense to me was why they were going to these lengths and at the same time. They didn't know each other and I never did anything wrong by them, so I couldn't figure out what I was missing

Send message...    ◻ ♡ ◁

**8:19**

I maintained my composure and complied with every aspect of what was happening. The detective involved in the case warned me to be very careful, as the language the women were using to him was indicative of this seeming like a collusion driven by spite based on their disdain at the result of the MPD investigation. He told me most people who are victims are relieved when such allegations are found to be false. However, their reaction in his view was "concerningly inconsistent".

It was at this point I made my parents and mentors aware of what was happening and obtained legal counsel.

13



14











**For the record** — August 20

What concerns me now is the continued posting of misleading and modified materials on public forums without proper context trying to paint me in some negative light. All stemming from Camille.

Claiming to speak for others while spreading false allegations is irresponsible and harmful to real advocacy work. Camille, you are not an innocent bystander or women's advocate by any means.

You manipulated and lied to women for your own purpose. Bitter scorned con-artist at best that is truly living up to the track record of not being able to handle rejection.

Send message...

**For the record** — August 20

You wrote: "Some were able to prevail, and some did not because they didn't have enough [proof]..."

The truth matters. Proof matters. If there are real stories to tell, bring them forward with evidence. But we both know it's literally not possible.

So you continue with the "Wow 💔💔💔 The stories that people are sharing about what happened to them is heartbreaking..."

Conjured up heresay. That is all. The difference between you and I is I stand on facts and provide legitimacy.

I have nothing to hide. You? Lies and behind fake names and fake pages at that.

Send message...

18



8:37

**For the record** 🏖️ August 20    ⋯ ✕

I don't talk down on anybody. I've never tried to defame anyone. I moved on years ago, focused on healing, growth and purpose. The whole experience was traumatizing for me. But I made it through and you are STILL stuck.

People can choose to stay stuck in bitterness. But it's a choice in the end.

I've chosen peace. I prayed for you. I've prayed for the unfortunate women that are victims of your lies, so far delusioned by your emotional manipulation that they were caught up in this nasty web orchestrated by you to "end me". I'm sure your real connection to me will be an interesting revelation to them, since I could never speak to them to inform them myself. It's the one thing you conveniently always seem to leave out of the stories you conjure up. Especially the ones you come on social media to tell. But of course your credit and impartiality go right out the window once we shine light on that, so that doesn't serve your purpose.

My life has been great, and God willing it's only getting better. I promise I am not worried about you or yours. And I won't be dragged back into falsehoods.

Send message...    ▢ ♡ ◁

8:38

**For the record** 🏖️ August 20    ⋯ ✕

You wrote I'm obsessed with you? I haven't spoken to you, spoken about you nor seen you since 2017 when I asked you respectfully to stay away, blocked you and ceased all communication. Your attempt last September with the nonsense you continue to try to pull is absolutely the only reason you have any relevance to me to this day.

You wrote I ruined your last relationship? I spoke to him, on the phone and again in Barcelona this past May. He confirmed what I already knew: more lies. We NEVER spoke of you. Even though I wanted to warn him of you badly, I didn't say a word to him about you. He also shared similar concerning experiences in relation to you, which is actually why he left you. Do you see the theme here?

Send message...    ▢ ♡ ◁

19







22



This is the first and last time I will speak on this matter publicly.

Camille, stop spewing false claims, documents or involving me or others in narratives unsupported by anything real or factual.

Move on and leave me and mine alone.

Men, particularly Black men, are often not afforded the benefit of the doubt in cases involving allegations especially of this nature.

This is why it is absolutely essential to keep accurate records, retain legal counsel (never defend yourself alone), and remain composed. Unfortunately we are often held guilty until proven innocent and MUST take measure to protect ourselves.

Before you judge anyone, especially in public forums:
➤ Pause.
➤ Ask questions.
➤ Seek the full context.
➤ Don't take everything at face value.

In a world flooded with misinformation, discernment matters.

**23**









EXHIBIT B

During this time, others came forward to express they experienced the same exact thing.

To cut to the end:

Some were able to prevail, and some did not because they didn't have enough and as one knows, the burden of proof falls on the person bringing the claim. Even if a person committed a crime and there is not enough burden of proof established, they can get off.

At this time, these ladies were young, afraid to tell their parents, and honestly had no money to pursue full on lawsuits. So they went through the school's system.

Why am I sharing this story?

Because I'm tired of the abuser dragging me into this narrative for going on 7 years. Leave me alone!!!

You have lied your way through to avoid accountability and made up this narrative that I banded a group of women together to get you kicked out of medical school for revenge purposes when you and I both know that is not the case.

Take accountability for your sick ways and your harm to women. Enough is enough. I've kept quiet for 7 years.
Stop using me as a part of your testimony

MARIUS CHUKWURAH
@dr_mazi

We have not spoken or seen each other for 7 years, yet you have gone out of your way to defame me, slander me, attack my last relationship all because you refuse to tell the truth that you were recording your sexual encounters with women and sharing it! and enough is enough. The next time I hear you, I will take it upon myself to see you in court for the lies and slander.

I will never apologize for giving women the resources to defend themselves. I don't care who the person is, man or woman, if a crime has been committed and there is laws to protect, I will share that.



November 2017:

A person very close to me called and asked me to help their close friend with a potentially legal matter. This was when I was pursuing law. So a lot of people came to me at the time for things here and there (even though I was not an attorney, I had a year of law school under my belt & was currently working on the hill).

What was the issue: a woman was recorded during s*x & it was being shared with others without her knowledge.

This woman was in professional school & was under extreme distress when a classmate shared what they saw.

So what do I do? I began researching the law & what could be done.

Imagine being recorded during your most intimate moment, with somebody you trust, only to know they are recording and then showing others. Insane!!!

At the time when the initial victim was speaking to me, she didn't tell me who the person was. Which is very ok as it's not about who committed the crime against her, but that a crime was committed against her and she wanted to figure out what to do without also ruining her career.

She was petrified.

< **dr_mazi**                                    ...



**Mazi, MD, FACC** him

**137** posts          **50.7K** followers          **2,642** following

Cardiologist
Board Certified Sports Cardiologist
MGH-Harvard Cardiovascular Performance
Penn Cardiology
Duke Medicine    ... more

🔗 linkedin.com/in/mazimed

[ Follow ]          **Message**          **Subscribe**          v

    

    Asake❌NYC        AfroNation...    Cartagena



